* * * * * * * * * * *
Upon review of the competent evidence of record, with reference to the errors assigned, and finding good grounds to receive further evidence, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 * * * * * * * * * * * PLAINTIFF'S MOTION TO STRIKE DEFENDANT-APPELLEE'S BRIEF
Prior to the hearing of this matter before the Full Commission, Plaintiff filed a Motion seeking to strike from the record the Full Commission brief submitted by counsel for Taylor *Page 2 
Crane, Inc. and St. Paul Travelers (hereinafter referred to as "Defendants"), for failure to file Defendants' Full Commission brief within 25 days of service of Plaintiff's brief, pursuant to North Carolina Industrial Commission Rule 701(4). After careful consideration of the written and oral arguments of counsel, Plaintiff's Motion is hereby DENIED.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings. The parties are subject to the North Carolina Workers' Compensation Act. The parties are correctly designated, and there is no question as to the mis-joinder or the non-joinder of any party.
2. An employment relationship existed between the parties at all times relevant to these proceedings.
3. St. Paul Travelers (hereinafter referred to as "Defendant-Carrier") provided workers' compensation insurance coverage for Taylor Crane, Inc. (hereinafter referred to as "Defendant-Employer") at all times relevant to these proceedings.
4. Plaintiff's average weekly wage is $293.23, yielding a compensation rate of $195.50 per week.
5. The parties stipulated that all Industrial Commission forms and filings, motions, and associated exhibits, heretofore filed in this case, are admitted into evidence in this matter.
 * * * * * * * * * * * *Page 3 ISSUES
The issues for determination are:
1. Whether Plaintiff sustained a compensable injury by accident, as defined by the North Carolina Workers' Compensation Act?
2. Whether Plaintiffs are entitled to benefits under the North Carolina Workers' Compensation Act?
 * * * * * * * * * * *
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 42 years old. He began working for Defendant-Employer in June 2004 as a general laborer. Defendant-Employer is in the steel erecting business. Plaintiff's job duties generally consisted of setting steel columns, bolting beams, landing bar joists, placing stick bridging into bar joist during welding, and the like.
2. On December 28, 2004, Plaintiff and his co-worker, Mr. Nathan Claude Hall, were working on top of a steel frame building at Bemis Industries in Lenoir, North Carolina installing steel skylight frames. Plaintiff was working approximately 50 feet off of the ground. He was wearing a hard hat, but he did not tie himself off with a lanyard and safety lines. Plaintiff would generally position the steel frame while sitting on the bar joist, with his legs wrapped around the bar joist, as well as in the steel webbing underneath.
3. Plaintiff and Mr. Hall previously installed some skylight frames on the Bemis site, and were waiting for the crane operator to swing the crane arm with a skylight opening over to *Page 4 
them, so that they could position it. At the time, the crane was in a blind spot, such that the crane operator, Mr. Dale Von Jackson, could not see the position of Plaintiff in relation to the steel frame being held by the crane. As the steel frame was being lowered, Plaintiff noticed that it was being lowered above his head and Mr. Hall's head. When the steel frame stopped approximately six (6) inches above Plaintiff's head, he attempted to get the radio operator, Mr. Darryl Lee Poor, to communicate to the crane operator, Mr. Jackson, to boom the crane up so that the load would not come down on his head or on Mr. Hall's head. Mr. Poor did not comply with Plaintiff's request, even after several requests. Plaintiff then heard the crane "rev" up, and within seconds, the crane lowered the steel frame onto Plaintiff's head. The steel frame remained on Plaintiff's head, pushing him downward and backward, at the same time, for approximately 15 to 20 seconds. While the beam was on Plaintiff's head, he felt what he described as "crunching" and "squishing" sounds in his neck, as well as pain in his neck. Plaintiff estimated the weight of the steel frame to be approximately 100 pounds to 150 pounds, not including the weight of the crane's cable and ball. Plaintiff was unable to move from his position, and so he attempted to push the steel frame away with his hand, since he was afraid that the frame would fall onto his lap, or onto Mr. Hall or Mr. Poor.
4. Eventually, Plaintiff was able to push the steel frame off of him. After Plaintiff and his co-workers lowered the steel frame into place, Plaintiff came down off of the roof. He told his supervisor, which was the crane operator, Mr. Jackson, what happened, but did not inquire about filing an accident report at the time.
5. Mr. Hall was the only other employee working on top of the building frame with Plaintiff on December 28, 2004. Mr. Hall was sitting on the same steel frame as Plaintiff, between nine (9) and 10 feet away from Plaintiff, facing him. At the time of Plaintiff's work *Page 5 
accident, Mr. Hall testified that he knew the steel frame that the crane was holding above his head and Plaintiff's head was coming nearer to them because he heard the crane "rev." As such, Mr. Hall was looking at the steel frame that the crane was holding, but was also pulling his welding lead over at the same time, so that as soon as the frame landed he could weld it down. When Mr. Hall heard Plaintiff say, "[w]hoa, whoa, whoa, boom up, boom up . . . ," he looked directly at Plaintiff, and observed the steel frame that the crane was holding jerk a little bit as Plaintiff pushed it off of him. Mr. Hall saw the steel frame a split second after Plaintiff pushed it off of his head. Mr. Hall further testified that the description of the accident that Plaintiff gave was accurate, based upon what he observed. About 10 minutes after the accident, Mr. Hall and Plaintiff went on a break, at which time Plaintiff told Mr. Hall that he felt like he "strained a muscle in his neck . . . "as a result of the "accident with the roof frame," that just occurred.
6. Although Defendants produced witnesses who testified that they did not observe Plaintiff's head make contact with the steel frame that the crane was holding, this testimony does not mean that the accident did not, in fact, occur, as Plaintiff and Mr. Hall stated that it did. This testimony simply indicates that these witnesses were either not in a position to be able to observe the accident in the few seconds that it took to occur, or do not recall the accident, which occurred almost two (2) years prior to their hearing testimony.
7. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's testimony, as well as Mr. Hall's corroborating testimony, regarding Plaintiff's December 28, 2004 work injury, wherein a steel frame being held by a crane landed upon Plaintiff's head, to be credible.
8. Furthermore, the Full Commission finds, based upon the greater weight of the evidence, that Plaintiff told his immediate supervisor, Mr. Jackson, about his December 28, 2004 *Page 6 
work injury on his work break, immediately after the work injury occurred. Thus, the Full Commission finds that Defendants had actual notice of Plaintiff's work injury on December 28, 2004, and that Defendants suffered no prejudice by not receiving written notice of the work injury within 30 days.
9. Plaintiff testified that prior to his December 28, 2004 work injury, he never had any complaints with regard to his neck, back, and arms. Following the December 28, 2004 work injury, Plaintiff testified that he began having shooting, stabbing pains in his neck and down his back, as well as burning sensations in his back and in his shoulders. Plaintiff testified that he believed that this was the result of muscle strain, and so he did not seek any medical treatment until approximately four (4) weeks after the work injury, since the "muscle strain" he thought that he had did not subside.
10. On January 26, 2005, Plaintiff presented to Dr. Kerry Wendell Byrd at Valdese Family Practice for complaints of left neck pain, left shoulder pain, and numbness in the left hand and arm for approximately three (3) to four (4) weeks. Dr. Byrd testified that the notation "[n]o injury" in his progress note for January 26, 2005 signified that neither he nor Plaintiff could figure out anything in particular related to Plaintiff's symptoms. Dr. Byrd further testified that he asked Plaintiff what kind of work he did, and that Plaintiff indicated to him that he worked with steel, and used his arms quite heavily. Plaintiff further described to Dr. Byrd that his specific job duties included helping to land steel frames onto buildings. 11. Dr. Byrd indicated that the results of Plaintiff's physical examination on January 26, 2005 were consistent with either some sort of disc disease or some sort of neurological impingement to the left arm, specifically, a ruptured disc, a slipped disc, or a bulging disc. Consequently, Dr. Byrd ordered magnetic resonance imaging (MRI) of Plaintiff's cervical spine. *Page 7 
12. Plaintiff underwent an MRI on January 27, 2005, and then saw Dr. Byrd for a follow-up visit on January 31, 2005. Plaintiff's MRI revealed a right lateral disc bulge at the level of C5-C6, combined with hypertrophy of the joint where the vertebral bodies meet that caused some mild right C6 foraminal narrowing, as well as a left paracentral C3-C4 disc bulge without spinal stenosis, and with mild left C4 nerve root effacement, or impingement. At that time, Dr. Byrd did not think that Plaintiff's symptoms necessarily matched the findings on the MRI, although Dr. Byrd did indicate that in general, MRI findings do not always correlate with a patient's symptoms, and that in Plaintiff's case, with further evaluation, the MRI findings certainly had the potential to be consistent with Plaintiff's stated symptoms. Based upon this assessment, Dr. Byrd discussed treatment options with Plaintiff, including a possible referral to a neurosurgeon; however, neither Dr. Byrd nor Plaintiff wanted to pursue this option at that time. Therefore, Dr. Byrd and Plaintiff made the decision to try non-surgical options, including physical therapy and a trial of epidural steroid injections at Unifour Pain Center.
13. As of the date of the hearing before the Deputy Commissioner, Plaintiff neither sought nor received the epidural steroid injections and/or the physical therapy recommended by Dr. Byrd. Plaintiff testified that he believed that the epidural steroid injections at Unifour Pain Center would cost him $600.00 upfront; however, Plaintiff's health insurance co-payment at that time was $40.00 for a specialist such as a pain management physician. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff did not understand how his health insurance benefits worked, and thus, Plaintiff mistakenly believed that the epidural steroid injections at Unifour Pain Center recommended by Dr. Byrd would cost him $600.00 upfront. Moreover, the Full Commission finds, based upon the greater weight of the evidence, that due to *Page 8 
this misunderstanding, Plaintiff did not receive either the epidural steroid injections at Unifour Pain Center or the physical therapy recommended by Dr. Byrd.
14. Plaintiff testified that from December 28, 2004 to February 2005, his pain continued to increase, and he began experiencing numbness in his hands, which affected his grip. Despite Plaintiff's increasing pain and numbness, Plaintiff continued to work for Defendant-Employer until on or about March 9, 2005. By March 2005, Plaintiff testified that he was waking up in so much pain that he felt he could not do his job safely anymore. On or about March 9, 2005, Plaintiff made the decision to not return to his job with Defendant-Employer; however, Plaintiff chose to simply stop going to work, and Plaintiff did not communicate to Defendant-Employer that his reason for not returning to work was his claim of disability related to his December 28, 2004 work injury. At the time Plaintiff quit his job with Defendant-Employer in March 2005, he was making $10.50 per hour.
15. Upon leaving his employment with Defendant-Employer, Plaintiff continued to work, obtaining temporary jobs with several temporary employment agencies, and earning anywhere from $5.50 per hour to $9.00 per hour. At the time of the hearing before the Deputy Commissioner, Plaintiff was working through Able Body Labor in Hickory, North Carolina at Atlantic Corporation, earning $8.00 per hour, and working from approximately 7:30 a.m. through 5:00 p.m., three (3) to five (5) days per week. In this particular job with Atlantic Corporation, Plaintiff works as a band saw operator, which does not involve lifting over 20 to 30 pounds.
16. Plaintiff did not see Dr. Byrd again, or any other health care provider concerning his December 28, 2004 work injury, until November 13, 2006, at which time Plaintiff complained of numbness in his hands and fingers, bilaterally, but worse on the left; a patch of *Page 9 
numbness in the left distal leg over the pre-tibial area; pain in his neck, bilaterally, down into the trapezius areas, but worse on the left; pain radiating into both arms at times; a weakened grip, bilaterally; and headaches. At this office visit with Dr. Byrd, Plaintiff denied any symptoms related to his neck or back prior to his December 28, 2004 work injury, which Plaintiff described to Dr. Byrd as an incident involving a crane operator lowering a steel frame onto his head. Dr. Byrd's assessment at this time was that Plaintiff continued to have neck pain with arm symptoms, and now leg symptoms. Dr. Byrd, who testified the day after this office visit with Plaintiff, was of the opinion that Plaintiff needed further diagnostic testing, in order to evaluate any changes, as well as to more definitively correlate Plaintiff's symptoms following his December 28, 2004 work injury with the findings on the January 27, 2005 MRI. Further, Dr. Byrd indicated that a neurosurgical consultation would be the best means by which to obtain the additional diagnostic testing.
17. Dr. Byrd opined that the scenario described by Plaintiff, wherein a steel frame weighing approximately 100 pounds to 150 pounds landed on his head, could be a significant causative factor in Plaintiff's current (November 2006) neck, arm, back, and lower extremity complaints, as well as in the January 27, 2005 MRI findings.
18. Dr. William Thomas Thorwarth, Jr., who is a board-certified diagnostic radiologist, read Plaintiff's January 27, 2005 MRI. Dr. Thorwarth testified that Plaintiff's MRI findings revealed a moderate paracentral disc bulge at the C3-C4 level, without stenosis of the spine, but that there was some pushing by the disc bulge on the left C4 nerve root, as well as a right lateral disc bulge at the C5-C6 level with some bony overgrowth. Dr. Thorwarth opined that the C3-C4 disc bulge was fairly recent because it did not have bony overgrowth. Dr. Thorwarth stated that ". . . I don't think you can absolutely say that a disc bulge is a week old or a *Page 10 
month old. . . . [but] if it were longer than that, you would anticipate some bony reaction." Dr. Thorwarth further opined that the mechanism of injury, as described by Plaintiff and found as fact, herein, can cause the type of disc bulges seen on Plaintiff's January 27, 2005 MRI films.
19. Plaintiff never received the neurosurgical evaluation, the epidural steroid injections, or the physical therapy recommended by Dr. Byrd as necessary in order to evaluate any changes in Plaintiff's condition, as well as to more definitively correlate Plaintiff's symptoms following his December 28, 2004 work injury with the findings on the January 27, 2005 MRI. However, Plaintiff did not file a Form 18 Notice of Accident until May 19, 2005.
20. Based upon the greater weight of the evidence, the Full Commission finds that on December 28, 2004, Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer.
21. Although Plaintiff had complaints of neck, shoulder, and arm pain, and also objective findings of disc bulges on his January 27, 2005 MRI, the Full Commission finds, based upon the greater weight of the evidence, that without further diagnostic testing, there is insufficient evidence upon which to find that Plaintiff's November 2006 complaints are related to his December 28, 2004 work injury. Many of the complaints for which Plaintiff sought medical treatment in November 2006 were different from his January 26, 2005 complaints, which were closer in time to his injury. Specifically, Plaintiff's complaints relating to his December 2004 injury were to the left side of his neck, arm and hands and his November 2006 complaints were of bilateral numbness and pain in his arms, hands and fingers, bilateral pain in his neck, a patch of numbness in the left distal leg over the pre-tibial area down into the trapezius areas which was completely new, and headaches which was also a new complaint. *Page 11 
22. Even though Defendants had actual notice of Plaintiff's December 28, 2004 work injury, the Full Commission finds, based upon the greater weight of the evidence, that
Plaintiff did not provide Defendants with notice of his claim of disability as a result of his December 28, 2004 work injury until May 19, 2005. Plaintiff quit his job in March 2005 without notice to Defendant-Employer, and without a note from a treating physician removing him from his work with Defendant-Employer. The Full Commission does not find Plaintiff's testimony alone that after March 2005, he could no longer perform his job with Defendant-Employer to be sufficient to establish any incapacity to continue to perform his job.
23. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff has failed to meet his burden of proving that he is disabled as a result of his work related injury, as no physician removed Plaintiff from work due to his December 28, 2004 work injury, and Plaintiff has not otherwise established that he was unable to work, seek work or find suitable work as a result of his injury.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 28, 2004, Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6) (2007). As a result of Plaintiff's injury by accident, Plaintiff sought medical treatment in late January 2005 from Dr. Kerry Wendell Byrd, including two (2) office visits with Dr. Byrd, as well as an MRI ordered by Dr. Byrd. Such medical treatment was reasonably necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability and is therefore *Page 12 
compensable. The November 13, 2006 office visit with Dr. Byrd is too remote in time from the December 28, 2004 work injury, without further corroborating evidence, to establish its relationship to the December 28, 2004 work injury, and is not compensable. N.C. Gen. Stat. § 97-25
(2007).
2. There must be proof of a causal relationship between the injury and the employment. Kashino v. Carolina Veterinary Specialists MedicalServices, 186 N.C. App. 418, 650 S.E.2d 839 (2007). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v. Freight Carriers, 300 N.C. 164,265 S.E.2d 389 (1980). However, expert testimony need not show that a work accident caused an injury to a reasonable degree of medical certainty; rather, all that is required of expert testimony in a workers' compensation case is that it states "that a particular cause was capableof producing this injurious result." Davis v. Columbus County Schools,175 N.C. App. 95, 101, 622 S.E.2d 671, 676 (2005). (Emphasis added.)See also, Coe v. Haworth Wood Seating, 166 N.C. App. 251, 603 S.E.2d 549, (2004); Peagler v. Tyson Foods, 138 N.C. App. 593, 532 S.E.2d 207
(2000). The degree of an expert's certainty goes to the weight of their testimony, which is the duty of the Industrial Commission to determine.Adams v. Metals USA, 168 N.C. App. 469, 483, 608 S.E.2d 357, 365,aff'd per curiam, 360 N.C. 54, 619 S.E.2d 495 (2005). If an expert is unable to state with certainty that there is a nexus between an event and an injury, their testimony relating the two is at least some evidence of causation, if there is additional evidence which establishes that the expert's testimony is more than conjecture. Booker-Douglas v. JS TruckServ., Inc., 178 N.C. App. 174, 630 S.E.2d 726 (2006); Adams,168 N.C. App. 469, 608 S.E.2d 357, aff'd per curiam, *Page 13 360 N.C. 54, 619 S.E.2d 495 (2005). Thus, "could" or "might" causation testimony can be probative and competent evidence to prove causation, provided that there is additional evidence which is capable of taking the testimony out of the realm of mere speculation or conjecture.Young v. Hickory Business Furniture, 353 N.C. 227, 538 S.E.2d 912
(2000); Workman v. Rutherford Elec. Membership Corp., 170 N.C. App. 481,613 S.E.2d 243 (2005).
3. In this case, medical expert testimony from Dr. Byrd established that the mechanism of injury described by Plaintiff could be a significant causative factor in Plaintiff's complaints and MRI findings. Further, Dr. William Thomas Thorwarth, Jr. testified that the mechanism of injury described by Plaintiff can cause the disc bulges found on Plaintiff's MRI. The testimony of these medical experts, combined with the additional evidence which the Full Commission has found to be credible herein, that Plaintiff was asymptomatic before the December 28, 2004 work injury, but he felt immediate pain after the crane lowered a steel frame weighing from 100 pounds to 150 pounds onto his head and this pain progressed to the point that he sought medical treatment on January 26, 2005, establishes a causal relationship beyond mere speculation or conjecture between Plaintiff's complaints and MRI findings and his work related injury. Moreover, Dr. Thorwarth opined that the C3-C4 disc bulge found on the January 27, 2005 MRI was fairly recent because it did not have bony overgrowth. Thus, the Full Commission concludes that the greater weight of the competent evidence of record establishes a causal relationship between Plaintiff's injury and the conditions for which he sought and received medical treatment in January 2005.
4. Plaintiff is entitled to have Defendants provide medical treatment for his December 28, 2004 compensable work injury. Specifically, Plaintiff is entitled to have Defendants pay for the January 26, 2005 office visit with Dr. Kerry Wendell Byrd; the January *Page 14 
27, 2005 MRI ordered by Dr. Byrd; and the January 31, 2005 office visit with Dr. Byrd. Plaintiff is also entitled to have Defendants reimburse him for his out-of-pocket medical expenses incurred for the treatment of his December 28, 2004 compensable work injury. N.C. Gen. Stat. § 97-25
(2007).
5. Plaintiff has the burden of proving disability as a result of his December 28, 2004 work injury. Plaintiff quit his job in March 2005, without notice to Defendant-Employer, and without a note from a treating physician removing him from work. Considering all the evidence in this case, Plaintiff's testimony alone that after March 2005, he could no longer perform his job with Defendant-Employer, is insufficient to establish that he was no longer capable of performing his pre-injury work duties as a result of his injury or that his wage earning capacity was diminished as a result of his injury. In order to support a conclusion of disability, the Industrial Commission must find that an employee was incapable after his injury of earning the same wages he had earned before his injury in the same employment, that the claimant was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and that the claimant's incapacity to earn was caused by his injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). The claimant may meet his burden of proving inability to earn pre-injury wages in the same or other employment through the production of medical evidence that he is physically or mentally, as a consequence of his work related injury, incapable of working in any employment; the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; the production of evidence that he is capable of some work but it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or the production of evidence that he has obtained other employment at *Page 15 
a wage less than that earned prior to the injury. Russell v. LowesProduction Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993). Although Plaintiff found employment earning diminished wages after he quit his job with Defendant-Employer, the evidence does not establish that his work related injury caused him to earn lesser wages. Thus, Plaintiff has failed to prove that his work related injury caused any disability under the fourth method of proving disability underRussell or under the other three methods. Id. N.C. Gen. Stat. § 97-2(9) (2007).
6. Defendants had actual notice of Plaintiff's December 28, 2004 work injury on the same day that it occurred, since Plaintiff told his immediate supervisor, Mr. Dale Von Jackson, about his December 28, 2004 work injury on his work break, immediately after the work injury occurred. Thus, Defendants are not prejudiced by not receiving written notice within 30 days. N.C. Gen. Stat. § 97-22 (2007).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay for Plaintiff's past medical treatment related to his December 28, 2004 compensable work injury according to procedures adopted by the Industrial Commission. Specifically, Defendants shall pay for the following: the January 26, 2005 office visit with Dr. Kerry Wendell Byrd; the January 27, 2005 MRI ordered by Dr. Byrd; and the January 31, 2005 office visit with Dr. Byrd. Defendants shall also reimburse Plaintiff for his out-of-pocket medical expenses incurred for the treatment of his December 28, 2004 compensable work injury. Plaintiff's claim for payment for the November 13, 2006 office visit with Dr. Byrd is hereby DENIED. *Page 16 
2. Defendants shall pay for a neurosurgical evaluation of Plaintiff as recommended by Dr. Bryd. The parties shall have 15 days from the date of the filing of this Opinion and Award in order to designate a mutually agreeable neurosurgeon to evaluate Plaintiff. Should the parties be unable to mutually agree upon a neurosurgeon, they shall notify the Full Commission, which will, in turn, refer this matter to the Nurse's Section of the North Carolina Industrial Commission, in order to obtain a neurosurgical evaluation for Plaintiff. If further North Carolina Industrial Commission involvement is necessary following the neurosurgical evaluation, either party may request a hearing by filing a Form 33.
3. Plaintiff's claim for temporary total disability compensation is hereby DENIED.
4. Defendants shall pay the costs of these proceedings.
This the ___ day of October 2008.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 DISSENTING: S/___________________ BUCK LATTIMORE COMMISSIONER